# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIFFANY WASHINGTON,<br><br>   *Plaintiff*,<br> v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br><br>   *Defendant*. | Civil Action No. 16-2018 (TJK) |

## MEMORANDUM OPINION

  From 2008 to 2016, Plaintiff Tiffany Washington was a sergeant in the Metro Transit Police Department (the "MTPD"), a component of the Washington Metropolitan Area Transit Authority ("WMATA"), which operates the public transit system commonly known as the Metro. She worked at the MTPD's Revenue Collection Facility in Alexandria, Virginia, which processes fares gathered from Metro stations. During Washington's shift on September 18, 2015, the train transporting the fares—known informally as the "money train"—broke down and was repaired. Washington then left early for a medical appointment, without ensuring that another supervisor took her place. The money train then broke down again. Washington failed to notify any on-duty official with supervisory authority about the breakdown, and the two officers accompanying the train were left without any supervisor in charge for several hours. Following an investigation, the MTPD determined that Washington had violated its policies and demoted her in 2016.

  Washington has sued WMATA under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, claiming that her demotion amounted to unlawful discrimination based on her race, color and gender, as well as unlawful retaliation for a

complaint of harassment she filed in January 2015. WMATA has moved for summary judgment on all claims, arguing that no reasonable jury could find for Washington on the evidence in this case. ECF No. 17. For the reasons explained below, the Court will grant WMATA's motion and enter judgment in its favor.

## I. Factual and Procedural Background

Washington is an African-American woman. Am. Compl. ¶ 1.[1] WMATA hired her as an MTPD officer in 2001. Pl.'s Resp. SoMF ¶ 1. In 2008, she was promoted to sergeant. *Id.* ¶ 2. As a sergeant, she acquired new supervisory responsibilities. That is because MTPD "officers" (that is, those with a rank lower than sergeant) do not have supervisory authority, while MTPD "officials" (that is, MTPD personnel ranked sergeant and above) supervise the officers under their command. *Id.* ¶¶ 9, 12-15. As of September 2015, Washington was assigned to work at WMATA's Revenue Collection Facility (the "Facility") in Alexandria. *See id.* ¶ 36. Her shift ran from 9:30 a.m. to 6:00 p.m. *Id.* ¶ 38.

In January 2016, Washington was demoted from sergeant back to "officer." Am. Compl. ¶ 25; Pl.'s Ex. 18 (Letter of Demotion). The asserted basis for Washington's demotion lay in events that occurred on September 18, 2015. *See* Pl.'s Ex. 18 (Letter of Demotion). That morning, two MTPD officers (Officers Perkins and Gilani) reported for duty at the Facility to accompany the "money train" transporting Metro fares. *See* Pl.'s Resp. SoMF ¶ 46. That morning and early afternoon, the money train experienced mechanical problems and broke down at least once. *See* Pl.'s Opp'n at 10-11 (citing Pl.'s Ex. 4 (Gaddis Dep.) at 144:14-146:6, 152:16-

---

[1] In deciding the instant motion, the Court has relied on all relevant filings including the following: ECF No. 11 ("Am. Compl."); ECF No. 17 at 4-28 ("Def.'s Br."); *id.* at 29-41 ("Def.'s SoMF"); ECF Nos. 17-1 to 17-21 (WMATA's exhibits 1 through 21, each of which is cited as "Def.'s Ex. __"); ECF No. 20 ("Pl.'s Opp'n"); ECF No. 20-1 ("Pl.'s Resp. SoMF"); ECF Nos. 20-3 to 20-21 (Washington's exhibits 1 through 19, each of which is cited as "Pl.'s Ex. __"); ECF No. 23 ("Def.'s Reply").

2

154:1). No later than 1:15 p.m., Washington's supervisor, Lieutenant Biggs, left work as per his daily schedule, leaving Washington as the only "official" in charge of the Facility. Pl.'s Resp. SoMF ¶¶ 39-40, 68.

At around 4:15 p.m., Washington left the Facility for a medical appointment. *Id.* ¶ 47. She claims that Biggs had approved her taking medical leave earlier that day, although the parties dispute this fact. *See, e.g.*, *id.* ¶¶ 52, 54. Washington does not dispute that the only other persons she notified of her departure were two officers stationed at the Facility (Officers Patterson and Dean). *See id.* Thus, she did not notify any official with supervisory authority (other than, in her telling, Biggs) that she would be leaving early. *Id.* ¶ 53. She instructed the senior officer at the Facility to "check-off and secure the building" in her absence. *Id.* ¶ 56.

At some point either shortly before or after Washington left, the money train broke down again. *Id.* ¶ 51. Washington claims that she found out about the breakdown by way of a text message from the senior officer at the Facility (Officer Patterson). Pl.'s Opp'n at 12 (citing Pl.'s Ex. 3 (Washington Dep.) at 128:4-9). At around 4:45 p.m., Washington called one of the officers on the money train (Officer Perkins) to discuss the situation. Pl.'s Resp. SoMF ¶ 66; *see also* Pl.'s Opp'n at 12 (citing Pl.'s Ex. 2 (Washington Aff.)). According to Officer Perkins, he did not speak again to an MTPD official for over three hours—until around 8:00 p.m., when a different off-duty sergeant returned his call. *See* Pl.'s Ex. 12 (Sepulveda Report) at 4; *id.* Attach. 7 (Perkins' statement). At around 6:00 p.m., Washington sent Biggs, who was off duty at that time, text messages informing him about the problem with the train. Pl.'s Opp'n at 13 (citing Pl.'s Ex. 13 (text messages)). Washington also claims to have spoken with a Captain Ware, who was on duty that evening, although it is unclear when that happened and whether Ware called her or she him. *See* Pl.'s Ex. 3 (Washington Dep.) at 157:10-16, *cited in* Pl.'s Resp. SoMF ¶ 67.

Shortly after 8:00 p.m., the MTPD Watch Commander on duty that evening, Captain Sepulveda, became aware that the money train had broken down. Pl.'s Resp. SoMF ¶ 60. Subsequently, the money train was repaired, and the two officers aboard ultimately went off duty at 1:00 a.m. the following morning. *See* Pl.'s Ex. 12 (Sepulveda Report) at 4; *id.* Attachs. 7-8 (officers' statements). Captain Sepulveda then investigated the events of September 18. Pl.'s Resp. SoMF ¶¶ 61-62. Sepulveda interviewed Washington, Biggs, and the two officers who accompanied the money train, and also had Washington and Biggs complete a written questionnaire. *Id.* ¶¶ 63-64; *see* Pl.'s Ex. 3 (Washington Dep.) at 247:18-20. Washington claims that another WMATA official, Captain Brown, also participated in the investigation by asking her questions during her interview. Pl.'s Resp. SoMF ¶¶ 61-64. Brown's participation was improper, she suggests, because she had previously filed a claim of harassment against Brown with WMATA's Office of Employee Relations in January 2015. *See id.* ¶¶ 24-27, 64.

Based on this investigation, Sepulveda concluded that Washington had violated two MTPD policies. *See* Pl.'s Ex. 12 (Sepulveda Report) at 5-6. First, he found that Washington improperly failed to contact any on-duty MTPD "official" regarding the breakdown of the money train, leaving the two officers accompanying the train unsupervised for several hours. *Id.* She thereby "abandoned her supervisory duties," violating an MTPD policy requiring supervisors to be accountable for their direct reports. *See id.* He also found that Washington, by failing to ensure that the officers were relieved during their ordeal, had exercised poor judgment inconsistent with her position and "failed to adequately staff and maintain proper coverage." *Id.* at 6. He declined to find, however, that Washington had improperly failed to request leave. *See id.* at 6-7. He noted that Biggs and Washington disputed whether she had timely requested leave, and concluded that this reflected a "communication breakdown" between them. *Id.* at 7.

Based on Sepulveda's report, the MTPD's Chief ordered Washington demoted in January 2016. *See* Pl.'s Resp. SoMF ¶¶ 73, 76. Washington sought and obtained several internal levels of review of the Chief's decision. *Id.* ¶¶ 78-79. The final review was conducted by WMATA's Assistant General Manager for Bus Services, who upheld the decision based on the following "key points":

> 1) [Washington] admitted she left work early based on an informal agreement with Lt. Biggs; conversely, Lt. Biggs stated he did not grant [Washington] leave; 2) [Washington] failed to notify an on-duty official that she was leaving her shift early and failed to arrange for supervisory coverage; and 3) [Washington] was negligent in her responsibilities to her Officers, who were left unsupervised without an effective means of communicating with [Washington].

*Id.* ¶ 80.

On June 29 or June 30, 2016, Washington filed a charge with the Equal Employment Opportunity Commission ("EEOC"), bringing claims of discrimination and retaliation. *Id.* ¶¶ 28, 30. On July 6, 2016, EEOC issued a right-to-sue letter. *Id.* ¶ 32. On October 10, 2016, Washington filed this lawsuit. *Id.* ¶ 34. Her operative complaint brings four counts against WMATA. The first three allege that her demotion in January 2016 was motivated by unlawful discrimination based on her race, color and gender. Am. Compl. ¶¶ 41-76. The fourth count alleges that the demotion was in retaliation for having previously engaged in protected activity. *Id.* ¶¶ 77-92. After discovery closed, WMATA filed the instant motion for summary judgment. ECF No. 17.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriately

5

granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). Courts "are not to make credibility determinations or weigh the evidence." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.*

## III. Analysis

WMATA argues, first, that Washington failed to properly exhaust administrative remedies, *see* Def.'s Br. at 10-11, and second, that the evidence is insufficient to demonstrate either a discrimination or retaliation claim, *see id.* at 11-25. "[T]he Court is not required to decide the exhaustion issue first; failure to exhaust administrative remedies under Title VII . . . does not raise a jurisdictional hurdle, but rather constitutes an affirmative defense." *Nichols v. Young*, 248 F. Supp. 3d 1, 5-6 (D.D.C. 2017). Here, the Court will proceed past WMATA's exhaustion argument to the merits, because it is clear that there is no genuine issue of material fact supporting Washington's claims of discrimination and retaliation in violation of Title VII.

### A. Race, Color and Gender Discrimination

Title VII discrimination cases are adjudicated under a burden-shifting framework. First, the plaintiff must make out a "*prima facie* case of racial discrimination." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). If she does, the employer must

6

"articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. The plaintiff then "must be afforded a fair opportunity to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.*

Here, Washington claims that her demotion was the product of unlawful discrimination based on race, color and gender. Am. Compl. ¶¶ 41-76. WMATA asserts that its actions were not motivated by discrimination, but by its conclusion that Washington had acted in dereliction of her supervisory duties as an MTPD sergeant. Def.'s Br. at 14-15. Because WMATA has advanced a legitimate, nondiscriminatory reason for the demotion, the only question before the Court is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Wheeler*, 812 F.3d at 1114 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).

"In considering this question, [courts] ask 'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Id.* (alteration in original) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). "This Court does not sit as a 'super-personnel department' that reexamines an employer's business decisions, and 'may not second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id.* (citations omitted) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). The plaintiff bears the ultimate burden of showing intentional discrimination. *Id.*

Washington argues that record evidence creates a genuine issue of material fact on the question of whether WMATA's justifications are pretext, in two different ways. First, she argues that WMATA's "so-called legitimate reasons are false," because she never engaged in the misconduct she was accused of. Pl.'s Opp'n at 26-30. Second, she argues, WMATA has treated white, male employees who engaged in comparable misconduct more favorably than her. *Id.* at 30-34. The Court will examine each argument in turn, concluding that neither suffices to get her claims past summary judgment.

### 1. Alleged Deficiencies in WMATA's Investigation

Washington's first theory is that WMATA's asserted reasons for her demotion were false. This theory is challenging to prove, because it is not enough to show that WMATA's reasons were false—she must show that the officials who disciplined her did not actually believe those reasons. "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" *Fischbach*, 86 F.3d at 1183 (alterations, except first, in original) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). Nonetheless, such a theory can be viable under the right circumstances, as the D.C. Circuit has explained:

> A plaintiff can establish that an employer's stated reason for the adverse employment action was a pretext for discrimination by showing that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." "If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination." A plaintiff might also establish pretext with evidence that a factual determination underlying an adverse employment action is egregiously wrong, because "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." An employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer

8

> sought, not to discover the truth, but to cover up its own
> discrimination can also permit a factfinder to find pretext. Our
> purpose in smoking out pretextual employer rationales is to discern
> whether prohibited discrimination may be a real reason for the
> challenged action. A false "mistake" or obvious omission can
> itself bespeak discrimination.

*Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (citations omitted) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Aka*, 156 F.3d at 1293; *Fischbach*, 86 F.3d at 1183).

Washington's arguments do not meet this standard. The evidence shows that WMATA reached in good faith the factual conclusions underlying her demotion, which were set forth in Captain Sepulveda's report: that Washington left work early on September 18, 2015, without ensuring that someone with supervisory authority was in charge, and that she subsequently did not notify an on-duty official that there was a problem with the money train, thereby leaving the officers under her command without adequate supervision. *See* Pl.'s Ex. 12 (Sepulveda Report) at 1-5. As a result, the officers on the money train had to work until 1:00 a.m. the next morning without relief. *Id.* at 6. The Chief of the MTPD relied on these facts in demoting her. *See* Pl.'s Ex. 18 (Letter of Demotion). And through several subsequent layers of review, WMATA officials found these facts adequate to justify her demotion. *See* Pl.'s Ex. 19 (Grievance Correspondence and Decisions).

While Washington attempts to poke holes in these factual conclusions, her quibbles do not impugn the honesty of the WMATA officials who demoted her, or even directly contradict the key conclusions they relied upon in doing so. She relies heavily on evidence that her supervisor, Biggs, had approved her medical leave. *See* Pl.'s Opp'n at 26-28. But WMATA took this evidence into account during its investigation. *Cf. Mann v. WMATA*, 168 F. Supp. 3d 71, 89 (D.D.C. 2016) (explaining that report was not "egregiously wrong" when it incorporated

9

facts alleged by plaintiff), *aff'd*, 692 F. App'x 6 (D.C. Cir. 2017). Sepulveda's report noted that Washington and Biggs disagreed on whether she had requested leave earlier that day. *See* Pl.'s Ex. 12 (Sepulveda Report) at 2-3. Sepulveda effectively chose to credit both of them: he concluded that there was "communication breakdown" between Washington and Biggs, and therefore recommended that Washington not be disciplined for failing to properly request leave. *Id.* at 7. Therefore, she was not disciplined on this point. Moreover, this evidence does not suggest that WMATA acted dishonestly in concluding that Washington "failed to adequately staff and maintain proper coverage." *Id.* at 6. Even if Washington notified Biggs earlier in the day that she planned to leave early, she does not dispute that she never arranged for another official to take over her supervisory duties in her absence. And this also meant that no one was available to find replacements to timely relieve the officers accompanying the money train. *See* Pl.'s Ex. 12 (Sepulveda Report) at 6.

Washington also points out that she contacted Biggs while he was off duty to inform him the money train had broken down. Pl.'s Opp'n at 29. Once again, Sepulveda's report acknowledged this fact. Pl.'s Ex. 12 (Sepulveda Report) at 5. It nonetheless concluded that she "did not notify an *on duty* official of the situation and abandoned her supervisory duties." *Id.* at 5 (emphasis added). Here too, Sepulveda's conclusion was reasonable: Lieutenant Biggs had gone off-duty no later than 1:15 p.m., before the money train broke down again later in the afternoon. *See* Pl.'s Resp. SoMF ¶ 68. Moreover, Washington's handwritten answers during the investigation identified Biggs as the *only* official with supervisory authority whom she had contacted during the incident. *See* Pl.'s Ex. 12, Attach. 3 (Washington Statement), question 4.[2]

---

[2] In her response to WMATA's statement of undisputed facts, Washington seems to cast doubt on the authenticity of her handwritten comments, stating that she never filled out a written

10

Thus, even though Washington informed Biggs of the incident when he was off-duty, she did not notify any on-duty official who could take charge of the situation that a problem had arisen.

Washington now claims that she also contacted an on-duty official named Captain Ware. Pl.'s Opp'n at 29; Pl.'s SoMF ¶ 67 (citing Pl.'s Ex. 3 (Washington Dep.) at 157:10-16). But this evidence does not create a genuine issue of material fact for two reasons. First, as already noted, Washington's statement during the investigation did not identify Ware as someone she had spoken to, and WMATA's investigation cannot have been "egregiously wrong" because it omitted facts that Washington never raised. *See Burley*, 801 F.3d at 298-99. Second, Washington's testimony merely states that she talked to Ware at some point "that evening," without specifying when. *See* Pl.'s Ex. 3 (Washington Dep.) at 157:10-16. She also could not recall whether she contacted Ware or he contacted her. *See id.* Thus, her testimony is consistent with WMATA's conclusion (and her own handwritten statement) that she never contacted an on-duty official during the time frame in which the officers accompanying the money train were without supervision. *See* Pl.'s Ex. 12 (Sepulveda Report) at 5-6.

Washington further argues that she acted appropriately by maintaining contact with the senior officer at the Facility and one of the officers accompanying the money train, and by returning to the Facility later in the evening, shortly before 10:00 p.m. *See* Pl.'s Opp'n at 29-30; Pl.'s Ex. 3 (Washington Dep.) at 115:3-6. Once again, none of these points undermines the

---

questionnaire. *See* Pl.'s Resp. SoMF ¶ 64. But the record unambiguously supports the authenticity of this document: Sepulveda's report stated that Washington filled out a written questionnaire, which the report included as an attachment, and Sepulveda also put in an affidavit confirming that Washington had provided a written response to his questions. *See* Pl.'s Ex. 12 (Sepulveda Report) at 2; Def.'s Ex. 18 (Sepulveda Aff.) ¶ 8. In fact, Washington's own testimony contradicts her statement of facts and confirms that she wrote down and submitted answers to Sepulveda's questions after the oral interview. *See* Pl.'s Ex. 3 (Washington Dep.) at 247:18-20.

11

factual predicate for her demotion: that there was a period of several hours in which she failed to inform an on-duty official with supervisory authority that there was a problem.

Washington also picks at other factual nits, such as whether the officers accompanying the money train reported for duty at 5:30 a.m. or 9:30 a.m. on September 18, *see* Pl.'s Resp. SoMF ¶ 46. But Washington does not explain how these factual issues were material to the investigation. *See* Pl.'s Opp'n at 25-30. And in any event, the mere fact that WMATA may have disagreed with Washington on these minor factual points does not appear to have any bearing on the reasonableness of the ultimate decision to demote her. "Employers obviously have to resolve factual disagreements all the time in order to make employment decisions regarding hiring, promotion, discipline, demotion, firing, and the like. In many situations, employers must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information." *Brady*, 520 F.3d at 496. These additional factual disputes are of the type that WMATA could properly resolve in investigating Washington's conduct, without calling into question its basis for demoting her.

Having failed to impeach WMATA's factual conclusions, Washington also argues that WMATA misapplied its policies. Specifically, she claims that WMATA's policies allowed her to delegate her supervisory responsibilities to the senior officer at the Facility when she left, and that she did so. *See* Pl.'s Opp'n at 28-29. She does not dispute the basic fact that "officials" (MTPD employees at the rank of sergeant or higher) have supervisory responsibilities, whereas "officers" (MTPD employees ranked below sergeants) do not. *See* Pl.'s Resp. SoMF ¶¶ 9, 13. She nonetheless points to several pieces of evidence that show, in her view, that a sergeant can delegate her supervisory authority to a subordinate officer. *See id.* ¶¶ 15-18, 55, 59. First, she points out that WMATA's written policies require officers to follow their supervisors'

commands even when "relayed" by their fellow officers. *Id.* ¶ 16 (citing Pl.'s Ex. 7 (General Order 106) § IV.C.7; Pl.'s Ex. 4 (Gaddis Dep.) at 69:12-21). Next, she references the fact that WMATA's policies allow the first officer on the scene of a major incident to take charge until an official arrives. *Id.* (citing Pl.'s Ex. 8 (General Order 364); Pl.'s Ex. 9 (General Order 365)). WMATA's policies also empower (and encourage) supervisors "to delegate authority when feasible" in order to "meet their increasing responsibilities." *Id.* ¶ 17 (quoting Pl.'s Ex. 7 (General Order 106) § IV.C.12.b). Finally, she testified that officials at the Facility shared a common practice of delegating their duties to "experienced officers" when they left. *Id.* ¶ 55 (citing Pl.'s Ex. 3 (Washington Dep.) at 159:2-9, 163:5-168:17).

This argument fails for two reasons. First, the written policies she cites do not support her argument. Not one of them even remotely suggests that it is acceptable for an MTPD sergeant to delegate *all* of her supervisory duties to a subordinate officer at any time, much less when an ongoing crisis demands a supervisor's attention. Thus, the policies do not contradict WMATA's conclusion that Washington's conduct violated the overarching principle that officials must remain accountable for the performance of their subordinates. *See* Pl.'s Ex. 7 (General Order 106) § IV.C.9; Pl.'s Ex. 12 (Sepulveda Report) at 5-6. And even if the Facility officials had an informal practice of delegating their duties to officers when they left, it cannot explain why Washington failed, upon learning no later than 4:45 p.m. that the money train had broken down, to take charge of the situation or to notify an on-duty official of what had happened.

Second, even assuming WMATA's policies on delegation and supervision leave room for interpretation, that does not call into doubt that WMATA honestly evaluated her case. "The question here . . . is not whether Plaintiff in fact violated [WMATA] policies, but whether

13

[WMATA] decision-makers honestly and reasonably believed that [she] did so." *Evans v. District of Columbia*, 219 F. Supp. 3d 99, 107 (D.D.C. 2016). Thus, WMATA's "failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach*, 86 F.3d at 1183 (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)). Ultimately, WMATA's decision rested less on a mechanical application of its written policies than on its common sense conclusion, based on the events of September 18, 2015, that Washington had fallen down on the job and exercised poor judgment inconsistent with her continuing to occupy a supervisory role. *See* Pl.'s Ex. 12 (Sepulveda Report) at 5-6; Pl.'s Ex.18 (Letter of Demotion). The existence of some policies or practices that arguably supported Washington's conduct does not call into question the honesty of WMATA's conclusion.

As the foregoing analysis shows, no reasonable jury could conclude that WMATA's investigation yielded a factual conclusion so "egregiously wrong" that it was a lie. *Burley*, 801 F.3d at 296. Thus, Washington's first argument does not create a genuine issue of material fact regarding whether WMATA's justification for demoting her was a pretext for discrimination based on race, color or gender.[3]

### 2. Proposed Comparators

Washington's second argument is that she was treated less favorably than certain white, male employees who committed comparable offenses. "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-

---

[3] Washington's complaint alleged that WMATA conducted "an improper and incomplete investigation." Am. Compl. ¶ 50. But in her opposition to the instant motion, Washington has not presented any argument for how the investigative process (as opposed to WMATA's factual conclusions) was so unsystematic and incomplete as to support an inference of pretext. *See* Pl.'s Opp'n at 25-30. Therefore, the Court considers this theory abandoned.

situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee.'" *Wheeler*, 812 F.3d at 1115-16 (alteration in original) (quoting *Burley*, 801 F.3d at 301). "The question of whether employees are similarly situated in order to show pretext 'ordinarily presents a question of fact for the jury.'" *Id.* at 1115 (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* at 1116 (quoting *Burley*, 801 F.3d at 301).

This last factor—the similarity of the offenses—is dispositive here. "In order to be considered similarly situated, it is not necessary that the comparators engaged in the exact same offense; what is required is merely that the offenses are of 'comparable seriousness.'" *Id.* at 1118 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). The D.C. Circuit has explained:

> To require that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination. Common sense as well as our case law dictate that we reject such an approach.

*Id.* (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 488 (8th Cir. 1998), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)). For example, in *Wheeler*, the defendant's Rule 30(b)(6) witness had admitted that the plaintiff and the alleged comparators, all nurses at the same hospital, could be said to have engaged in "gross misconduct" that amounted to "negligence in the care of a patient or negligent medicine administration." *Id.* at 1118. On that record, despite variations in the exact misconduct each

comparator had committed (and the fact that some of the comparators, unlike the plaintiff, had no prior disciplinary history), "a jury could reasonably determine that [the plaintiff's] misconduct was categorically similar to the misconduct of the proposed comparator nurses." *Id.* at 1119.

By contrast, summary judgment for the employer is appropriate where there is an important qualitative difference between the purported comparators' conduct and the plaintiff's. For example, in *Burley*, the plaintiff, a railroad engineer, had derailed a train after failing to heed a "blue signal," a serious offense in the train company's view. *See* 801 F.3d at 293-94. The D.C. Circuit, affirming the lower court's grant of summary judgment for the defendant, reasoned in relevant part that the plaintiff was not similarly situated to other employees who had not gone through a blue signal, even one who had derailed a train. *See id.* at 302. Similarly, in *Evans v. District of Columbia*, 219 F. Supp. 3d 99 (D.D.C. 2016), the plaintiff, a police officer, was disciplined after an investigation discovered that he had improperly worked as a security guard at a liquor store, received gifts while on duty, and lied about his conduct to investigators (including the FBI). *Id.* at 103-04. The court granted summary judgment for the defendant, concluding that the plaintiff was not similarly situated to officers who had committed similar misconduct without lying about it, noting that the "act of dissembling by a police officer does not merely impugn the officer's integrity, it also has far-reaching consequences for his capacity as a witness against an accused." *Id.* at 109.

Here, Washington has identified three comparators, all of them white, male MTPD sergeants. The first kept an all-terrain vehicle owned by the MTPD at his home for a year and a half, used it for his personal benefit, and damaged it; he was suspended for 10 days. Pl.'s Opp'n at 16; Def.'s Ex. 21 at 3. The second was accused of sexual harassment after he asked out a

16

female WMATA employee via text message; the MTPD cleared him of the harassment charge because it found no evidence his text messages were unwelcome or sexually explicit, but nonetheless suspended him for three days for conduct that brought discredit or the appearance of discredit on himself or the MTPD. Pl.'s Opp'n at 17; Def.'s Ex. 21 at 4-5. The third had a traffic accident while driving a rental car but did not immediately notify any MTPD official; he was not punished because WMATA determined this conduct did not violate any of its policies. Pl.'s Opp'n at 17; Def.'s Ex. 21 at 1-2. None of the three was demoted.[4]

These comparators do not help Washington's case because none engaged in conduct as serious as hers. Their conduct differed from hers in a key respect: not one engaged in conduct that called into question his ability to perform a sergeant's supervisory duties. Washington did, and as a result, the MTPD "lost confidence in [her] ability to perform in a leadership position." Pl.'s Ex. 18 (Letter of Demotion). This difference fully explains why she alone was demoted. And while Washington argues that two of these comparators were found to have violated one of the same "general orders" that she violated, *see* Pl.'s Opp'n at 32-33, that is of no moment: the general order in question applies broadly to many different types of conduct, *see* Pl.'s Ex. 17 at 8-11 (General Order 217), and the proposed comparators "engaged in different conduct to violate different aspects of the same rule." *Dudley v. WMATA*, 924 F. Supp. 2d 141, 162 (D.D.C. 2013). Therefore, Washington's proposed comparators do not permit the inference that WMATA's justifications for her termination are pretextual.

In light of the above, the Court will grant summary judgment for WMATA on Washington's discrimination claims.

---

[4] The parties' motion papers also mention two other potential comparators, but both parties ultimately agree that they are not viable because their conduct was too different from Washington's. *See* Def.'s Br. at 18-19; Pl.'s Opp'n at 33-34.

**B.     Retaliation**

Title VII prohibits employers "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [42 U.S.C. §§ 2000e to 2000e-17]." 42 U.S.C. § 2000e-3(a). A retaliation claim under Title VII requires the plaintiff to show "(1) that an employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013). Washington's retaliation claim fails because she has not introduced any evidence to show that she engaged in statutorily protected activity.

Washington's theory of retaliation rests on a complaint she had previously made against Captain Brown to WMATA's Office of Employee Relations in January 2015. *See* Pl.'s Opp'n at 36-38. The complaint asserted that Brown had "harassed and unfairly treated" her. *Id.* at 36. Specifically, Washington claimed that Brown unnecessarily "interrogate[d] her" about various aspects of her job performance, improperly required her to undergo drug screening, and confiscated her firearm until the screening was complete. *See* Pl.'s Ex. 16. And Washington's complaint was "not so much [about] what [Brown was] asking but [the] manner [in which it was] being asked." *Id.* She claims that, despite this prior complaint, Brown inappropriately participated in WMATA's investigation into the subsequent money-train incident by asking her questions during her interview. *See* Pl.'s Opp'n at 36-37.[5]

---

[5] WMATA, in its briefing, also references an EEO charge Washington made in 2008, arguing that it occurred far too long before Washington's 2016 demotion to form the basis for a retaliation claim. *See* Def.'s Br. at 22-23. Washington does not assert any retaliation claim based on the 2008 complaint in her opposition. *See* Pl.'s Opp'n at 34-38. The Court therefore treats WMATA's argument on this point as conceded.

"Not every complaint garners its author protection under Title VII. While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (citations omitted). For example, in *Cole v. Boeing Co.*, 75 F. Supp. 3d 70 (D.D.C. 2014), *aff'd*, 621 F. App'x 10 (D.C. Cir. 2015), the plaintiff told an investigator "that she felt she was being harassed and that she would also like to file a charge with the [agency's] Equal Employment Opportunity (EEO) office." *Id.* at 79. The court concluded that plaintiff failed to make out a retaliation claim because she had never complained of harassment that amounted to unlawful discrimination. *See id.* at 80; *see also Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 188-89 (D.D.C. 2018) (rejecting retaliation claim where there was "no evidence that . . . plaintiff alleged discrimination on the basis of gender").

The same is true here. Washington asserts, in her response to WMATA's statement of undisputed material facts, that her 2015 complaint alleged that Brown had engaged in discriminatory conduct. *See* Pl.'s Resp. SoMF ¶ 22. But the evidence she cites, *see id.* ¶¶ 22-27, does not back up this assertion. WMATA's records of the 2015 complaint describe an accusation that Brown "harassed" Washington as discussed above, in the sense that he was purportedly rude to her—but without any hint that his conduct was based on race, gender, or any other category protected under Title VII. *See* Pl.'s Ex. 16. Nor do the cited portions of Washington's own testimony describe any complaint of unlawful discrimination. *See* Def.'s Ex. 13 (Washington Dep.) at 242:16-243:8, 243:21-22. Thus, Washington has not shown that she ever engaged in protected activity.

One final point. The parties dispute whether WMATA's Office of Employee Relations, to which Washington directed her 2015 complaint, handles complaints of discrimination at all.

WMATA argues that it does not; Washington argues that it does. *See* Pl.'s Resp. SoMF ¶ 23. But even assuming Washington is correct, the matter is immaterial to the outcome here. Washington does not assert that the Office of Employee Relations *exclusively* handles discrimination claims. Thus, the mere fact that she directed her 2015 complaint to that office does not imply—one way or the other—that she alleged unlawful discrimination. The D.C. Circuit has made a similar observation about the EEOC:

> [The plaintiff's] threat to contact the EEOC does not help his cause. The bare invocation of "EEOC," divorced from any allegation of unlawful discrimination on a statutorily prohibited ground, does not constitute protected activity under Title VII. Indeed, the EEOC hears complaints under a broad variety of non-discrimination statutes in addition to Title VII, including those that prohibit age, disability, and genetic-information discrimination. [The plaintiff's] naked reference to the "EEOC" thus does not provide any basis for inferring opposition to racial discrimination.

*Robbins v. District of Columbia*, 650 F. App'x 37, 40 (D.C. Cir. 2016) (citations omitted).

Accordingly, the Court must enter summary judgment for WMATA on Washington's retaliation claim.

IV. **Conclusion**

For all of the above reasons, WMATA's Motion for Summary Judgment (ECF No. 17) will be granted, and judgment entered in WMATA's favor, in a separate order.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 7, 2018